**23 MAG 5225**

Approved: _____
Andrew K. Chan / Sarah Lai / Olga I. Zverovich
Assistant United States Attorneys

Before:  THE HONORABLE SARAH L. CAVE
United States Magistrate Judge
Southern District of New York

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

|  |  |
|---|---|
| UNITED STATES OF AMERICA | **SEALED COMPLAINT** |
| - v. - | Violations of 18 U.S.C. §§ 1349, 1956(h), and 371 |
| EUGENE WILLIAM AUSTIN, JR., a/k/a "Hugh Austin," | COUNTY OF OFFENSE: NEW YORK |
| Defendant. |  |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

SOUTHERN DISTRICT OF NEW YORK, ss.:

JASON S. SAMUELS, being duly sworn, deposes and says that he is a Special Agent with U.S. Department of Homeland Security, Homeland Security Investigations, and charges as follows:

### COUNT ONE
**(Conspiracy to Commit Wire Fraud)**

1. From at least in or about 2017 through at least in or about 2021, in the Southern District of New York and elsewhere, EUGENE WILLIAM AUSTIN, JR., a/k/a "Hugh Austin," the defendant, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit wire fraud, in violation of Title 18, United States Code, Section 1343.

2. It was a part and an object of the conspiracy that EUGENE WILLIAM AUSTIN, JR., a/k/a "Hugh Austin," the defendant, and others known and unknown, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343, to wit, AUSTIN agreed with others to engage in a scheme to make false statements and promises

to numerous victims in order to obtain money and cryptocurrency, which scheme was furthered through emails, text messages, and other interstate electronic communications to and from the Southern District of New York.

(Title 18, United States Code, Section 1349.)

## COUNT TWO
### (Conspiracy to Commit Money Laundering)

3. From at least in or about 2017 through at least in or about 2021, in the Southern District of New York and elsewhere, EUGENE WILLIAM AUSTIN, JR., a/k/a "Hugh Austin," the defendant, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to engage in monetary transactions in property derived from specified unlawful activity, in violation of Title 18, United States Code, Section 1957.

4. It was a part and an object of the conspiracy that EUGENE WILLIAM AUSTIN, JR., a/k/a "Hugh Austin," the defendant, and others known and unknown, would and did knowingly engage and attempt to engage in a monetary transaction, as defined in Title 18, United States Code, Section 1957(f)(1), in criminally derived property of a value greater than $10,000 that was derived from specified unlawful activity, to wit, wire fraud, in violation of Title 18, United States Code, Section 1343, in violation of Title 18, United States Code, Section 1957.

(Title 18, United States Code, Section 1956(h).)

## COUNT THREE
### (Conspiracy to Commit Interstate Transportation of Stolen Property)

5. From at least in or about 2017 through at least in or about 2021, in the Southern District of New York and elsewhere, EUGENE WILLIAM AUSTIN, JR., a/k/a "Hugh Austin," the defendant, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit an offense against the United States, to wit, interstate transportation of stolen property, in violation of Title 18, United States Code, Section 2314.

6. It was a part and an object of the conspiracy that EUGENE WILLIAM AUSTIN, JR., a/k/a "Hugh Austin," the defendant, and others known and unknown, would and did knowingly transport, transmit, and transfer in interstate and foreign commerce any goods, wares, merchandise, securities and money, of the value of $5,000 and more, knowing the same to have been stolen, converted and taken by fraud, in violation of Title 18, United States Code, Section 2314.

Overt Acts

7.      In furtherance of the conspiracy and to effect the illegal object thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

  a.      In or about February 2018, EUGENE WILLIAM AUSTIN, JR., a/k/a "Hugh Austin," the defendant, and AUSTIN's son Brandon P. Austin ("Brandon") fraudulently induced a Japanese cryptocurrency company to conduct an interstate cryptocurrency transaction for approximately $600,000 worth of cryptocurrency, for the purported purchase of fundraising and marketing services, which were never provided to the victim.

  b.      In or about August 2018, AUSTIN and Brandon fraudulently induced a partner at a California-based investment firm to send an interstate wire transfer of approximately $5 million to a Manhattan-based attorney, for the purported purchase of cryptocurrency, which was never paid.

  c.      In or about September 2018, AUSTIN and Brandon fraudulently induced a cryptocurrency start-up company to send an interstate wire transfer of approximately $100,000 to a bank account controlled by Brandon Austin for a purported cryptocurrency investment opportunity with high returns, which was instead spent on gas, restaurants, hotels, flights, and cash withdrawals.

  d.      In or about January 2019, AUSTIN and Brandon fraudulently induced the founder and chairman of a New Jersey- and Hong Kong-based cryptocurrency investment firm to send an interstate wire transfer of approximately $4 million to a Georgia-based attorney for the purported purchase of cryptocurrency, which was never paid.

  e.      In or about June 2020, AUSTIN and Brandon embezzled approximately $776,000 that had been sent via an interstate wire transfer to the trust account of a New York-based real estate attorney for the purported purchase of cryptocurrency.

  f.      In or about October 2021, AUSTIN and Brandon embezzled approximately $574,000 that had been sent via an interstate wire transfer to the bank account of a Manhattan-based investment firm for the purported purchase of cryptocurrency.

(Title 18, United States Code, Section 371.)

The bases for my knowledge and the foregoing charges are, in part, as follows:

8.      I am a Special Agent with Homeland Security Investigations ("HSI") of the U.S. Department of Homeland Security, assigned to a Financial Crimes Group.   I have received training and have participated in investigations of financial crimes, including crimes involving cryptocurrency.   I am familiar with the facts and circumstances set forth below from my personal participation in the investigation, including my examination of reports and records,

interviews I have conducted, and conversations with other law enforcement officers and other individuals.  Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation.  Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, unless noted otherwise.

## OVERVIEW

9.     As detailed below, EUGENE WILLIAM AUSTIN, JR., a/k/a "Hugh Austin," the defendant, participated in a scheme with his son Brandon P. Austin[1] ("Brandon") and others to steal money from investors and other victims by fraudulently offering to, among other things: (1) serve as a broker for sales of large quantities of cryptocurrency at below-market exchange rates; (2) provide short-term investments in cryptocurrency for purportedly high returns; and (3) provide marketing and advertising services to small businesses, while knowing that, in fact, AUSTIN and Brandon would not provide the promised cryptocurrency, returns, or services. AUSTIN also frequently sought personal loans from friends and acquaintances in connection with AUSTIN's purported cryptocurrency and investment businesses, falsely promising to pay lenders back with interest.  In each instance, investors and lenders lost their money, and AUSTIN and Brandon frequently spent investors' funds on personal expenses, including airline travel, luxury hotels, restaurants, shopping, as well as nominal payments to victims to prolong the scheme.  In total, AUSTIN and Brandon have caused more than $10 million in actual losses to over 20 victims.  Below are several examples of victims who have been defrauded by AUSTIN and Brandon:

### Victim-1

10.    As further discussed below, an Indianapolis-based bank ("Victim-1") was the victim of a scheme in which emails purportedly sent by a Victim-1 employee authorized the wire transfer of approximately $776,000 from the bank accounts of Victim-1's customers into the trust account of a New York-based real estate attorney ("Attorney-1").  In fact, the emails were fraudulent and Victim-1's customers had never authorized the transfer of the funds.  Prior to the funds being sent, EUGENE WILLIAM AUSTIN, Jr., a/k/a "Hugh Austin," the defendant, and Brandon agreed with others to engage in an over-the-counter cryptocurrency transaction to convert the funds from Victim-1 into cryptocurrency.  At AUSTIN and Brandon's instruction, Attorney-1 transferred the stolen funds into the bank account of a money transmitting business, which converted the funds into cryptocurrency and transferred the cryptocurrency to AUSTIN and Brandon.  When AUSTIN and Brandon later learned that the funds had been fraudulently sent to Attorney-1's trust account without authorization, they only arranged for the return of approximately $200,000, but kept the remaining funds for themselves.  AUSTIN and Brandon

---

[1] On or about April 13, 2023, Brandon P. Austin pleaded guilty in the United States District Court for the Southern District of New York to participating in a money laundering conspiracy, in violation of Title 18, United States Code, Section 1956(h), and is currently awaiting sentencing.  *See United States v. Brandon P. Austin*, 23 Cr. 199 (PKC).

continued to transfer the remaining funds through different accounts and spent the money on personal expenses, despite their knowledge that the funds were stolen.

11. Based on my conversations with other law enforcement officers, my review of law enforcement reports, my review of bank records, and my review of text messages seized from Brandon's cellphone and Apple iCloud Account pursuant to search warrants, I have learned the following, in substance and in part:

   a. On or about June 12, 2020, approximately $776,000 was fraudulently transferred without authorization from the bank accounts of two customers of Victim-1 into the trust account of Attorney-1. Victim-1 later discovered that fraudulent emails that appeared to authorize the wire transfers were sent to Victim-1 employees. In fact, Victim-1's customers had never authorized the transfer of the funds to Attorney-1.

   b. On or about June 18, 2020, approximately $745,530 of the funds stolen from Victim-1 was transferred from Attorney-1's trust account to the bank account of a money transmitting business owned by a co-conspirator not named herein ("CC-1") (the "CC-1 Bank Account").

   c. On or about June 19, 2020, approximately $745,480 was transferred from the CC-1 Bank Account to the bank account of a cryptocurrency trading and investment firm, which was used to purchase approximately 80 Bitcoin ("BTC") that was deposited into a cryptocurrency address that Brandon had provided to CC-1 in a text message (the "Brandon Austin Cryptocurrency Address"). Between on or about July 2, 2020, and on or about July 8, 2020, a cryptocurrency account in the name of Brandon Austin (the "Brandon Austin Cryptocurrency Account-1") received approximately 62.40 BTC either directly or indirectly from the Brandon Austin Cryptocurrency Address, which was then converted into U.S. dollars.

   d. Between on or about July 7, 2020, and on or about July 9, 2020, approximately $566,049 was transferred from the Brandon Austin Cryptocurrency Account into a bank account in the name of "Thor Ventures"—for which Brandon was the sole signatory (the "Thor Ventures Bank Account").

   e. Between on or about July 7, 2020, and on or about September 8, 2020, nearly all of the money in the Thor Ventures Bank Account was either transferred to other bank accounts in the names of Brandon, an individual identified as the girlfriend of EUGENE WILLIAM AUSTIN, Jr., a/k/a "Hugh Austin," the defendant, or spent on, among other things, luxury hotels, Apple gift cards, restaurants, AUSTIN's child support payments, and Amazon purchases. During this time period, AUSTIN sent Brandon numerous requests for transfers of money to various individuals, which were executed by Brandon.

   f. On or about July 8, 2020, approximately $200,000 was transferred from the Thor Ventures Bank Account back to Attorney-1's trust account.

12. Based on my review of text messages from Brandon Austin's cellphone and Apple iCloud Account, I have learned the following, among other things:

5

        a.      On or about January 8, 2020, a WhatsApp contact saved in Brandon's cellphone for a particular individual ("CC-2") sent a message to Brandon's WhatsApp account and a WhatsApp account saved in the cellphone as "Hugh," which appears to have been used by EUGENE WILLIAM AUSTIN, Jr., a/k/a "Hugh Austin," the defendant, (the "Austin WhatsApp Account"),[2] proposing that AUSTIN and Brandon serve as suppliers of large quantities of cryptocurrency to CC-2 and to buyers seeking to purchase cryptocurrency represented by CC-2:

> Here is a breakdown of opportunities so we are all aligned: 1. No KYC / CIS guy – Going to [name of attorney] in NY.  Brandon will generate an invoice for 30 BTC at +5%.  All transactions will be at +5%.  At +5%, there is an 8% spread/margin.  8% will be divided 4 ways (2% to buyside and mandate, 2% to Facilitator Group (that's me and [another individual]), 4% to Austins and Seller mandate . . . I do not know the buyer, buyer mandate et al so I can't speak to the creditability whatsoever.  Please prepare [name of attorney] for a possible "shitshow".  That said, who knows.  Process is simple… 1. Buyer sends funds to Law firm.  All funds must clear.  Once cleared, escrow atty will notify seller.  Seller will send coins.  Seller gets paid.  2.  Seller will send coins within 1 business day after funds clear.  3.  Buyer must always have send funds first.

        b.      Based on my training, experience, and participation in this investigation, I believe that, in the above message, "mandate" refers to the broker closest to the principal of each transaction (buyer or seller) and "KYC/CIS" refers to know-your-customer and customer-information-sheet.  I further believe that the above message demonstrates AUSTIN, Brandon, and CC-2 knew that they would be engaging in illicit transactions because CC-2 warned AUSTIN and Brandon that the transactions would not be supported by KYC/CIS records and that the attorney AUSTIN and Brandon choose as an escrow agent should be prepared for a "shitshow."

        c.      On or about June 12, 2020—the date when $776,000 was transferred without authorization from Victim-1's customer accounts to Attorney-1's trust account—CC-2 sent a message to Brandon: "Gentlemen.  Good news.  The first wire has shown up and we feel the second wire will be arriving this evening . . . [F]irst thing Monday morning, we will conduct business and have BTC to you within 1-2 hours."

        d.      On or about June 16, 2020, the Austin WhatsApp Account contacted CC-1—the signatory on the bank account that received approximately $745,530 of Victim-1's stolen funds on or about June 18, 2020—and created a WhatsApp group titled "[CC-1] Hugh & Brandon 2020."  AUSTIN, Brandon, and CC-1 then discussed a potential transaction for the purchase of 75 BTC.  On or about June 18, 2020, CC-1 messaged Brandon: "Wire received and

---

[2] Based on my review of the text messages sent and received by the Austin WhatsApp Account, the user-provided photograph linked with the Austin WhatsApp Account, and my conversations with multiple witnesses who have identified the AUSTIN WhatsApp Account as being used by EUGENE WILLIAM AUSTIN, Jr., a/k/a "Hugh Austin," the defendant, I know that the AUSTIN WhatsApp Account was used by AUSTIN.

being processed.  I'll watch it and let you know when it's cleared."  On or about June 19, 2020, AUSTIN—following the successful receipt of cryptocurrency in the Brandon Austin Cryptocurrency Address—stated: "Bring in the wart hog" | "Tell them you'll bring the 5M order."  Brandon then responded: "I see it" | "Call you in 10-15" | "So we can get you paid."  Based on my training, experience, and participation in this investigation, I believe that, in the above messages, AUSTIN and Brandon used CC-1 to convert Victim-1's stolen funds into cryptocurrency.  Following the successful transaction, AUSTIN told CC-1 that he later intended to use CC-1 for a future transaction involving the conversion of $5 million into cryptocurrency.

        e.        On or about June 18, 2020—the same date when approximately $745,530 of the stolen funds was transferred from Attorney-1's trust account to the CC-1 Bank Account—Brandon sent a series of messages to CC-2: "The Bank called and said the transaction was fraudulent and someone hacked into the two accounts to send us the $776k.  If you want you can forward that.  If they release the hold we can get the coins within 30 minutes."  Later that day, CC-2 wrote to Brandon: "Going stealth for a while.."  Brandon responded: "Understood.  I'll ping you if I hear anything new from here.  They must be hackers though."  CC-2 stated later that day: "Why don't we just turnover the monies to the appropriate people vs giving it back to the account until someone from the account can step forward." | "people = authorities."  Brandon responded: "Yea I'm sure [Attorney-1] will probably do something like that.  I assume once BofA hears from chase the money will be locked up."  On June 22, 2020, CC-2 stated: "No word back from the buyers/clients on releasing of funds/Satoshi."[3]  Brandon responded: "Ah gotchya.  Seems like they're actually a group of hackers then."  CC-2 responded: "I don't believe they are hackers   I believe they are in with the end clients and scammers vs. hackers."

        13.        Based on my conversations with Attorney-1, I have learned the following, in substance and in part:

        a.        In or about June 2020, Attorney-1 was introduced to AUSTIN and Brandon as brokers of cryptocurrency who needed to use Attorney-1's trust account as an escrow for a large cryptocurrency transaction.  Following the clearance of approximately $776,000 into Attorney-1's trust account, Attorney-1 transferred $745,530 of those stolen funds to the CC-1 Bank Account at Brandon's request.

        b.        Shortly after transferring the funds to the CC-1 Bank Account, Attorney-1 was contacted by representatives of Victim-1, who stated that the funds had been transferred to Attorney-1's trust account without authorization.  Attorney-1 then informed AUSTIN and Brandon that the funds that Attorney-1 had received were stolen and needed to be returned immediately.

        c.        AUSTIN and Brandon eventually arranged for the return of $200,000 into Attorney-1's trust account, which was returned to Victim-1 through law enforcement.  However,

---

[3] Based on my training and experience, I know that "Satoshi" is a term frequently used to refer to a test transaction of a small quantity of cryptocurrency to prove that a particular individual controls the cryptocurrency stored in a particular address.

AUSTIN and Brandon never returned the remaining money to Attorney-1 for purposes of repaying Victim-1, despite numerous attempts by Attorney-3 to contact AUSTIN and Brandon.

14. In sum, based on my training, experience, and participation in this investigation, including my review of other text messages and bank records, it appears that AUSTIN and Brandon had agreed to supply approximately $776,000 worth of BTC to a buyer represented by CC-2. To facilitate this transaction, AUSTIN and Brandon instructed CC-2 to arrange for the funds to be deposited into Attorney-1's trust account, which was then transferred to the CC-1 Bank Account and converted into cryptocurrency. Brandon later learned on or about June 18, 2020, however, that the source of the funds was "fraudulent" and "someone hacked into the two accounts to send us the $776k." Despite learning that the funds were stolen, however, Brandon and AUSTIN kept over $500,000 in stolen proceeds. Brandon and AUSTIN returned approximately $200,000 to Attorney-1's trust account, but stole the remaining money, which was converted into cryptocurrency, converted back into U.S. currency, and deposited into Brandon's bank accounts, and later spent on personal expenses for AUSTIN and Brandon, like luxury hotels, gift cards, restaurants, Amazon purchases, and AUSTIN's child support payments.

## Victim-2

15. Based on my conversations with a partner ("Victim-2") at a California-based investment firm, my review of text messages and emails between Victim-2 and EUGENE WILLIAM AUSTIN, JR., a/k/a "Hugh Austin," the defendant, and my review of documents, I have learned the following, in substance and in part:

a. In or about the Summer of 2018, Victim-2 was looking to invest in cryptocurrency by purchasing approximately $5 million in Bitcoin ("BTC") through a so-called "over-the-counter" cryptocurrency transaction.[4] Victim-2 was introduced to AUSTIN and Brandon, who were the principals of a company named "Valkyrie Group LLC." AUSTIN and Brandon claimed that they had extensive experience in brokering successful transactions involving large quantities of cryptocurrency and could supply large quantities of BTC. AUSTIN and Brandon also proposed to use a Manhattan-based attorney ("Attorney-2") as an escrow agent for the transaction. AUSTIN assured Victim-2 that the transaction would be successful and promised to personally guarantee that the cryptocurrency transaction would be successful with AUSTIN's own personal estate.

b. On or about August 3, 2018, AUSTIN sent an email to Victim-2 attaching a proposed sales contract in which Valkyrie Group LLC promised to sell $5 million worth of BTC to Victim-2's investment firm. The contract contained a guarantee in which AUSTIN and a company owned by AUSTIN named "Valhalla Venture Group LLC" guaranteed that the $5 million worth of BTC would be provided to Victim-2's investment firm. The contract stated, in relevant part:

---

[4] Based on my training and experience, over-the-counter cryptocurrency transactions are purchases of large quantities of cryptocurrency from private sellers, which frequently charge lower fees and premiums than regulated cryptocurrency exchanges to carry out a transaction.

> GUARANTEE: It is understood that Valhalla, represented by Hugh Austin and his estate, will guarantee to make available to [Victim-2's investment firm] the sum of five million dollars USD, if and to the extent that [Victim-2's investment firm] has not received the BTC for which it has provided the funds for this transaction within 15 business days or a reasonable amount of time as agreed upon by both Parties, whichever is shorter, of such funds being removed from escrow. Valhalla or Hugh Austin will make this payment available to [Victim-2's investment firm] immediately after such period and without recourse.

Based on my review of a transcript of a deposition of AUSTIN from in or about May 2022 conducted by counsel for Victim-2 and my review of bank records and credit reports, I know that AUSTIN did not own any significant assets or otherwise have any significant amount of money in any bank accounts at the time of this contract.

   c. Pursuant to the contract, on or about August 6, 2018, Victim-2's investment firm wired $5 million to the trust account of Attorney-2, who, as noted above, AUSTIN and Brandon selected as the escrow agent. On or about August 7, 2018, approximately $3 million was wired from Attorney-2's trust account to a bank account located in Hong Kong. On or about August 24, 2018, an additional approximately $1.6 million was wired from Attorney-2's trust account to the same bank account located in Hong Kong. However, Victim-2's investment firm did not receive the promised BTC. To date, Victim-2's investment firm has not received any BTC and has only been able to recoup approximately $400,000 from Attorney-2's trust account. Law enforcement has not been able to trace the ultimate destination of Victim-2's funds after those funds were transferred to Hong Kong.

   d. On or about February 19, 2019, Victim-2's investment firm filed a complaint in New York County Supreme Court against, among others, AUSTIN and Brandon, alleging fraud, conversion, and breach of contract relating to this transaction. On or about February 10, 2020, a default judgment was entered against AUSTIN in the amount of $4.6 million.

<u>Victim-3</u>

  16. Based on my conversations with the founder and chairman of a New Jersey- and Hong Kong-based cryptocurrency investment firm ("Victim-3"), my review of text messages and emails between Victim-3 and EUGENE WILLIAM AUSTIN, JR., a/k/a "Hugh Austin," the defendant, and my review of documents, I have learned the following, in substance and in part:

   a. In or about January 2019, Victim-3 was introduced to AUSTIN and Brandon, who were represented to be the purported brokers for an opportunity to purchase large quantities of BTC through an over-the-counter cryptocurrency transaction. On or about January 3, 2019, Victim-3's investment firm entered into an agreement for a purchase of approximately $4 million worth of BTC from "Valkyrie Group, LLC," which was signed by Victim-3, Brandon, and the individual who had introduced Victim-3 to AUSTIN and Brandon. Under the agreement, a Georgia-based attorney ("Attorney-3") would serve as the escrow agent for the transaction.

9

b.      On or about January 3, 2019, Victim-3's investment firm wired approximately $4 million to Attorney-3's trust account. Between on or about January 3, 2019, and on or about January 4, 2019, approximately $2 million was wired from Attorney-3's trust account to a variety of other bank accounts, including, among other transactions: (1) approximately $1.2 million to an account at a Chinese bank; (2) approximately $440,000 to bank accounts registered in the name of Attorney-3, Attorney-3's law firms, and affiliates of Attorney-3's law firms; and (3) approximately $375,000 to a bank account for another company that was owed money by Attorney-3. However, Victim-3's investment firm did not receive the promised BTC.

c.      On or about January 7, 2019, Victim-3's investment firm demanded that AUSTIN, Brandon, and Attorney-3 return Victim-3's money by January 9, 2019. However, Victim-3's investment firm did not receive any money until January 18, 2019, when Victim-3's investment firm received $2 million from Attorney-3's trust account. To date, Victim-3's investment firm has only been able to recoup a total of approximately $2.3 million of the $4 million Victim-3 sent to Attorney-3, and has otherwise received no BTC.

d.      On or about March 1, 2019, Victim-3's investment firm filed a complaint in the United States District Court for the Northern District of Georgia against, among others, AUSTIN and Brandon, alleging fraud and breach of contract, among other causes of action, relating to this transaction. On or about March 28, 2023, a default judgment was entered against AUSTIN and Brandon in the amount of approximately $1.5 million.

<u>Victim-4</u>

17.     As further discussed below, a particular individual ("CC-3") who operated a real estate company (the "CC-3 Company") was introduced to AUSTIN and Brandon for the purpose of engaging in an over-the-counter purchase of cryptocurrency on behalf of a buyer. As it turns out, the source of the funds from CC-3's buyer was a fraudulent check. After a Pennsylvania-based bank ("Victim-4") cashed the fraudulent check and deposited funds into the CC-3 Company's bank account with Victim-4, CC-3 arranged for approximately $576,000 to be sent to AUSTIN and Brandon, but AUSTIN and Brandon simply misappropriated the funds and never provided the promised cryptocurrency to CC-3. Instead, AUSTIN and Brandon spent the money on, among other things, wire transfers to AUSTIN's family and friends, airline tickets, cellphones, restaurants, gas, designer apparel, and luxury hotels.

18.     Based on my conversations with law enforcement officers and my review of law enforcement reports and bank records, I have learned the following, in substance and in part:

a.      On or about October 15, 2021, a check in the amount of approximately $574,000 drawn on the account of a prominent law firm ("Law Firm-1") and payable to the CC-3 Company was deposited into the CC-3 Company's bank account with Victim-4. Based on my conversations with a representative of Law Firm-1, I know that this check was fraudulent and not authorized by Law Firm-1.

    b. On or about October 18, 2021, approximately $528,000 was transferred from the CC-3 Company's bank account to a bank account in the name of a Manhattan-based investment firm ("Company-1"). On or about October 19, 2021, approximately $438,000 was transferred from Company-1's bank account to another bank account in the name of another Manhattan-based investment firm ("Company-2").

    c. Between on or about October 18, 2021, and on or about October 29, 2021, nearly all of the funds were wire transferred out of Company-1's bank account and Company-2's bank account, including, among other transactions: (1) approximately $10,000 to the daughter of EUGENE WILLIAM AUSTIN, JR, a/k/a "Hugh Austin," the defendant; (2) approximately $32,000 to Brandon's girlfriend; (3) approximately $62,000 to a car dealership to purchase a Jaguar vehicle for Brandon's girlfriend; (4) approximately $10,000 to AUSTIN's girlfriend; (5) approximately $20,000 to the daughter of AUSTIN's girlfriend; (6) approximately $50,000 to the mother of one of AUSTIN's children; and (7) approximately $78,000 to a bank account opened in the name of "Thor Ventures" for which Brandon served as the signatory, where the money was spent on, among other things, airline tickets, cellphones, restaurants, gas, designer apparel, and luxury hotels for AUSTIN and members of AUSTIN's family.

  19. Based on my conversations with representatives from Company-1 and Company-2, I have learned the following, in substance and in part:

    a. Company-1 and Company-2 were introduced to EUGENE WILLIAM AUSTIN, JR, a/k/a "Hugh Austin," the defendant, and Brandon to provide services as "paymasters" for a cryptocurrency transaction involving AUSTIN, Brandon, and CC-3.[5]

    b. After CC-3 sent approximately $528,000 to Company-2's bank account, however, CC-3 began complaining to Company-1 and Company-2 that CC-3 did not receive the promised cryptocurrency from AUSTIN and Brandon. When Company-1 and Company-2 raised these concerns to Brandon, Brandon stated that CC-3 was lying. When the complaints persisted, Company-1 and Company-2 also informed AUSTIN about CC-3's complaints. AUSTIN promised that AUSTIN and Brandon would be supplying the promised cryptocurrency to CC-3 in the near future, but this never happened.

  20. Based on my review of text messages from a cellphone seized during a court-authorized search of CC-3's residence, I have learned the following, in substance and in part:

    a. On or about October 21, 2021 (after CC-3 had already sent approximately $576,000 to Company-1's bank account, and the funds began to be dissipated),

---

[5] Based on my training, experience, and participation in this investigation, I know that "paymasters" typically receive payments by buyers in large transactions to be held in escrow, and they disburse to the sellers and brokers on the transaction. Typically, a paymaster is a neutral third party and has no knowledge of the particulars of the transaction. In return for their services, the paymaster charges a small fee, which is paid directly to the paymaster prior to disbursement.

EUGENE WILLIAM AUSTIN, JR, a/k/a "Hugh Austin," the defendant, sent a message to CC-3, stating: "I'm confident you and I will be working together for a long time."

    b.  On or about October 23, 2021, AUSTIN sent another message to CC-3, saying: "[CC-3], as per our conversation, Monday we will deliver the first tranche of $100K worth of BTC, followed by a second delivery of $430K.  I have also sent over the wallet address that one of our Family Offices who is a big Middle Eastern Asset Manager is liquidating for their client.  Since this week was so chaotic, we received a verbal commitment that the BTC will be sent first for the $2.2M transaction and you will have 48 hours to settle upon receipt of BTC.  We thought that this was a goodwill gesture and demonstrate our commitment to your business and working together."   CC-3 responded: "Hugh you have to understand I told my buyer we would have $100,000 BTC this morning and the rest plus extra on Monday.  His wallet has not reflected the $100,000.  This makes me look bad.  Can you please look into this and see what happened?"

    c.  On October 26, 2021, CC-3 sent a message to AUSTIN, stating: "I have to ask this as instructed by my buyer [CC-3's client looking to convert the $528,000 into cryptocurrency]: We hereby demand the bitcoins we paid for on 10/18/2021 and was promised to us upon posting of the funds be delivered to the wallet provided by 11am 10/26/2021 or that a wire transfer slip showing that $528,000 plus $1,750 in interest for a total of $529,750 be returned to [Company-2].  I believe my buyer and myself have waiting far too long.  We live in a world of certainty and punctuality and neither are given to us by . . . Brandon, hugh.  We can not accept the promise of 'its coming' when since last Wednesday night and each day since I was told I would have coins the next day.  So my demand is this: send the coins or return the funds. I hope you can appreciate the position I am in.  I represent a buyer and repeat to him what you all say and none of it is ever true, thus I have destroyed my relationship with this buyer.  Further more my buyer thinks I have stolen his funds.  Put yourself in my shoes.  Please let me know your intentions.  Thank you." AUSTIN responded: "[CC-3], I w call u in about 25 minutes.  Thanks Hugh."

    d.  Between in or about November 2021 and in or about February 2022, CC-3 continued asking AUSTIN for status updates on the delivery of BTC to CC-3's buyer, but AUSTIN continued telling CC-3 that the BTC was still coming in the future.  CC-3 never received any BTC from AUSTIN or Brandon in exchange for the approximately $528,000 that was paid to Company-1 and Company-2.

<u>Victim-5</u>

21.  Based on my conversations with a founder and CEO of a former cryptocurrency start-up company ("Victim-5") and my review of bank records, I have learned the following, among other things:

    a.  In or about early 2018, Victim-5 was introduced to EUGENE WILLIAM AUSTIN, JR., a/k/a "Hugh Austin," the defendant, and Brandon, who held themselves out as experienced cryptocurrency investors who had been involved in hundreds of successful

12

cryptocurrency investment deals.   AUSTIN and Brandon invited Victim-5 to travel with them to Miami, New York City, and Europe, where AUSTIN and Brandon were purportedly executing cryptocurrency investment deals.

        b.     In or about September 2018, AUSTIN and Brandon offered Victim-5 a cryptocurrency investment opportunity, in which they promised to provide a 50% return on an investment of $100,000.   Victim-5 agreed, and on or about September 6, 2018, Victim-5's company transferred approximately $100,000 to a bank account in the name of "Valkyrie Group" with Brandon as the sole signatory.   Immediately after the transfer, approximately $36,000 was transferred to personal accounts in the name of Brandon, where the vast majority of the money was spent on debit card purchases and cash withdrawals.   Much of the rest of the money that had been transferred from Victim-5's company was spent on gas, restaurants, hotels and flights, including hotels and flights booked in AUSTIN's name.   Based on the bank records for the Valkyrie Group and Brandon, it does not appear that AUSTIN and Brandon invested any of Victim-5's money.

        c.     Over the next year, Victim-5 repeatedly asked AUSTIN and Brandon about the status of the investment, but Victim-1 never received the principal of Victim-5's investment or the promised 50% return.

        d.     On or about January 9, 2019, Victim-5's company filed a complaint in the Manatee County Circuit Court in Florida against, among others, AUSTIN and Brandon, alleging breach of contract, fraud, and unjust enrichment relating to this transaction.   On or about September 29, 2020, a default judgment was entered against AUSTIN and Brandon in the amount of $100,000.

### Victim-6 and Victim-7

22.    Based on my conversations with an individual ("Victim-6") and my review of bank records and records provided by Victim-6 to law enforcement, I have learned the following, among other things:

        a.     In or about 2018, Victim-6 was introduced to EUGENE WILLIAM AUSTIN, JR., a/k/a "Hugh Austin," the defendant, and Brandon, who held themselves out as principals for a company named "Small Cap Nation"—a marketing firm for cryptocurrency investment firms seeking to get media exposure.   Victim-6 initially met with AUSTIN in Manhattan, and Victim-6 agreed to refer a Japanese cryptocurrency company ("Victim-7") to AUSTIN for purposes of engaging in a fundraising and marketing contract with Small Cap Nation.

        b.     On or about February 9, 2018, Victim-7 entered into a "Memorandum of Understanding" (the "February 2018 Contract") with Small Cap Nation, which was signed by AUSTIN.   In the February 2018 Contract, Small Cap Nation promised to provide a number of fundraising and marketing services to Victim-7, including, among other things, meetings with investors in New York City and Silicon Valley, introducing Victim-7 to a multi-billion dollar

international hedge fund, and a variety of video releases and marketing services. In exchange for these services, Victim-7 promised to pay approximately $500,000 in cryptocurrency to Small Cap Nation, with an additional $500,000 in compensation after Small Cap Nation raised $3 million in new investments for Victim-7. Between in or about February 2018 and in or about April 2018, Victim-7 sent over $600,000 in cryptocurrency payments to a cryptocurrency account in the name of Brandon—consistent with Victim-7's initial payment to Small Cap Nation.

        c.      After Victim-7 provided its initial payment to AUSTIN and Brandon, Victim-7 did not receive the promised fundraising meetings with investors, introduction to a multi-billion dollar hedge fund, or additional marketing services. As a result, Victim-7 requested a refund from AUSTIN and Brandon in or about August 2018. AUSTIN promised to provide a refund to Victim-7, but never paid back Victim-7 or provided the promised services.

        d.      In or about August 2018, AUSTIN also asked Victim-6 for a series of loans totaling approximately $130,000 to assist in "closing" over-the-counter cryptocurrency transactions, as well as access to Victim-6's credit card, which AUSTIN used for charges totaling over $50,000 in concert tickets, travel, and other entertainment-related expenses. AUSTIN never repaid Victim-6. Instead, in or about December 2018, Victim-6 received a "Promissory Note" from AUSTIN and Brandon in which they promised to, among other things: (1) pay $187,000 in money owed to Victim-6; and (2) pay $150,000 to Victim-7. To date, Victim-6 and Victim-7 have not received any of the money owed to them by AUSTIN and Brandon.

WHEREFORE, I respectfully request that an arrest warrant be issued for EUGENE WILLIAM AUSTIN, JR., a/k/a "Hugh Austin," the defendant, and that he be imprisoned or bailed, as the case may be.

        /s Jason S. Samuels  (By Court with Authorization)
        JASON S. SAMUELS
        Special Agent
        Homeland Security Investigations

Sworn to by reliable electronic means
pursuant to Fed. R. Cr. P. 4.1 & 41(d)(3)
this 30th day of June 2023

_[signature: Sarah Cave]_
THE HONORABLE SARAH L. CAVE
UNITED STATES MAGISTRATE
JUDGE SOUTHERN DISTRICT OF NEW YORK